UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| St. Panteleimon Russian Orthodox Church, Inc.,<br><br>       Plaintiff,<br><br>v.<br><br>Church Mutual Insurance Company,<br><br>       Defendant. | Case No. 13-cv-1977 (SRN/HB)<br><br>**MEMORANDUM OPINION AND ORDER** |

Ross M. Hussey, Udoibok, Tupa & Hussey, PLLP, The Grain Exchange, Suite 310M, 400 South Fourth Street, Minneapolis, MN 55415, for Plaintiff.

Christian A. Preus and Henry Pfutzenreuter, Meagher & Geer, PLLP, 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I. INTRODUCTION

This matter is before the Court on Defendant Church Mutual Insurance Company's Motion for Summary Judgment [Doc. No. 25]. For the reasons stated below, the Court grants Defendant's Motion.

## II. BACKGROUND

### A. The Parties and the Insurance Policy

Plaintiff St. Panteleimon Russian Orthodox Church, Inc. is a Minnesota nonprofit corporation that owns real property located at 2210 Franklin Avenue South, Minneapolis, Minnesota 55414 (the "Property"). (Compl. [Doc. No. 1] ¶ 5.) Defendant Church Mutual

Insurance Company is a mutual insurance company incorporated in, and with its principal place of business located in, the State of Wisconsin.  (See id. ¶¶ 2, 5; Answer [Doc. No. 5] ¶¶ 2, 5.)  In January 2011, Defendant issued to Plaintiff an insurance policy with a property coverage limit of $1,046,500, effective February 2, 2011 through February 2, 2014. (Bednarski Aff. [Doc. No. 29], Ex. 1 at 2.)  The Policy provides coverage for loss "caused by or resulting from any Covered Cause of Loss," (id., Ex. 1 at 4), which is defined to mean "risks of direct physical loss unless the loss is:  1. Excluded under Exclusions; or 2. Limited under Limitations," (id., Ex. 1 at 5).  In the event that a covered loss occurs, the Policy provides Defendant with several options for payment, including paying "the cost of repairing or replacing the lost or damaged property."  (Id., Ex. 1 at 21.)

This coverage is subject to certain conditions.  (See id., Ex. 1 at 20.)  For example, under the "Valuation" condition, Defendant will not pay more for a loss than "[t]he amount [Plaintiff] actually spen[t] that is necessary to repair or replace the lost or damaged property."  (Id., Ex. 1 at 23.)  And, in the event of loss or damage, Plaintiff must send to Defendant "a signed, sworn proof of loss containing the information [Defendant] request[s] to investigate the claim."  (Id., Ex. 1 at 21.)  In addition, if Defendant and Plaintiff "disagree on the value of the property or the amount of the loss," either party may demand an appraisal.  (Id., Ex. 1 at 20.)

    **B.**    **The Loss and the Initial Inspections and Estimates**

On March 19, 2010, there was a wind storm at the Property.  (See Mayhew Aff. [Doc. No. 31], Ex. 1 at 2.)  According to Defendant, wind is not an excluded cause of loss and is, therefore, covered under the Policy.  (Def.'s Mem. of Law in Supp. of Summ. J.

[Doc. No. 27] ("Def.'s SJ Mem.") at 4; see Bednarski Aff., Ex. 1, at 5–8.)  Therefore, when Plaintiff sought coverage for damage caused by the storm, Defendant hired an outside professional insurance adjuster, Bill Berscheid, to investigate the claim and calculate the amount of the loss.  (See Bednarski Aff., Ex. 6 at 4.)  As part of his investigation, Mr. Berscheid retained Stephen Mayhew, a Senior Associate Engineer with Wiss, Janney, Elstner Associates, Inc., who has approximately two decades of engineering experience involving wood structures, to render a professional opinion as to the scope of damage caused to the Property by the wind storm.  (See Mayhew Aff. [Doc. No. 31], Ex. 1 at 1; id., Ex. 3.)

Meanwhile, Plaintiff hired Michael DuPont, a general contractor and owner of United Exteriors Midwest, Inc., who has approximately thirty-five years of experience in the construction industry, to fix the roof of the church.  (See Preus Aff. [Doc. No. 28], Ex. 1 (Alekseyenko Dep. 32:5-13, 35:4-25); id., Ex. 2 (DuPont Dep. 18:1-5, 21:16–22:8).)  Plaintiff designated Mr. DuPont as its representative for purposes of its insurance claim, (see Bednarski Aff., Ex. 7), and Mr. DuPont sent letters to Mr. Berscheid on April 20 and April 24, 2012, estimating the insurance claim at $66,320.37 and $64,565.00, respectively, (Bednarksi Aff., ¶ 4 & Ex. 2; Hussey Aff. [Doc. No. 36] ¶ 1 & Ex. 3).

Thereafter, Mr. Mayhew performed site inspections of the Property on May 17 and May 29, 2012.  (Mayhew Aff., Ex. 1 at 2.)  Based on the site inspections and his review of the weather data for March 19, 2012, Mr. Mayhew concluded in his June 2012 report that an ornamental, onion-shaped dome (the "Dome") had fallen from the church's roof as a result of the wind storm.  (Id., Ex. 1 at 4.)  Other than the damage to the Dome and two roof

rafters, he found "[n]o other structural damage . . . due to the wind event." (Id.) However, he did note that the Dome had impacted a metal chain-link fence, and that approximately six ceiling tiles had incurred water damage as a result of the Dome falling. (Id., Ex. 1 at 1–2.) Mr. Bersheid then prepared an estimate of the cost to repair this damage. His estimate, completed in September 2012, was $77,633.81. (See id., Ex. 6 at 8.) Mr. Berscheid provided this estimate to Thomas Elert, a Senior Project Manager and Estimator for Legacy Services Corporation who has approximately thirty years of experience estimating the cost of construction projects. (See Elert Aff. [Doc. No. 30] ¶ 1 & Ex. 2.) Mr. Elert agreed that the repair work could be completed for that amount. (See id. ¶ 2.)

Mr. DuPont disputed Mr. Mayhew's findings and, at Mr. DuPont's request, another engineer was hired to conduct an inspection of the Property. (See Bednarski Aff., Exs. 2, 3, 6, 8.) That engineer, Gene Bolgrean, wrote a letter to Mr. DuPont in March 2013 stating that, based on his "cursory visual observation," he "recommend[ed] that the existing conditions be more thoroughly investigated." (Id., Ex. 3; see id., Ex. 4.) Defendant disagreed with the need for further investigation, finding that no repair or reinforcement beyond that specified by Mr. Mayhew was necessary. (See id., Ex. 5.)

In May 2013, Plaintiff demanded an appraisal of the dollar amount of damages. (Id., Ex. 9.) In response, Defendant notified Plaintiff that Plaintiff was required to "submit a proof of loss identifying all covered damages being claimed, along with all supporting documentation for those amounts," in order to proceed with the appraisal. (Id., Ex. 10.) Consequently, Plaintiff submitted a sworn proof of loss stating that the "whole loss and damage to the described property as a result of this loss," and the "actual cash value of

4

repairs or replacement being claimed," was $1,046,500.00—i.e., the Policy's limit.  (Id., Ex. 11.)  Defendant rejected the proof of loss, noting that it was not accompanied by supporting documentation and was "without question not consistent with the damages at issue."  (Id., Ex. 12 at 1.)  Defendant also rejected Plaintiff's request for an appraisal because Plaintiff "ha[d] not stated its disagreement with the amount of loss or damage caused by the March 19, 2012 wind event."  (Id., Ex. 12 at 2.)  Defendant explained that "[s]imply claiming the full policy limits . . . is not sufficient," and that "[t]he appraisal process is limited to a genuine disagreement of the value of the property or the amount of loss from a covered cause of loss."  (Id.)

On July 9, 2013, Defendant made its "final payment" with regard to the wind damage at the Property.  (Id., Ex. 6 at 1.)  In total, Defendant paid Plaintiff $92,833.81.  (See id.)  That amount consisted of the $77,633.81 estimate, plus $15,200.00 for Mr. Bolgrean's inspection of the Property.  (See id., Ex. 6 at 10.)

### C.     This Lawsuit

Plaintiff filed its Complaint in this matter on July 23, 2013, claiming that "[a]s a result of the Storm, the Property incurred extensive damages to the building structure, including, but not limited to, damages to the onion dome, the roofing deck, church interior, damages associated with the costs of clean up and debris removal as well as compliance with local ordinances and building codes for the repairs, and other items covered under the Policy."  (Compl. ¶ 15.)  Plaintiff alleges that Defendant refused to provide sufficient funds to cover the loss and refused to participate in the appraisal process.  (Id. ¶¶ 19, 21.)  Based on these allegations, Plaintiff brings three causes of action.  In Count I, Plaintiff seeks a

declaratory judgment that "the Policy provides [Plaintiff] with insurance coverage for the Claim and that the Church is entitled to prompt payment for the Loss as submitted per the Policy, and if the amount of loss is in dispute, the right to an appraisal of the amount of loss per the Policy and applicable laws and statutes." (Id. ¶ 29.) In Count II, Plaintiff alleges that Defendant breached the Policy by refusing to pay Plaintiff's insurance claim in full and refusing to participate in an appraisal. (See id. ¶¶ 34–37.) And, in Count III, Plaintiff asserts, in the alternative, a claim for unjust enrichment based on Defendant's retention of the premiums Plaintiff paid for property insurance coverage. (See id. ¶¶ 38–43.)

### D.     Plaintiff's Motion to Compel Appraisal

On September 30, 2013, Plaintiff filed a Motion to Compel Appraisal and Stay Court Proceedings [Doc. No. 10]. Because Plaintiff's claims for declaratory judgment and breach of contract assert that Plaintiff is entitled to an appraisal, the Magistrate Judge determined that Plaintiff's Motion sought a ruling on the merits of a portion of those claims and treated the Motion as one for partial summary judgment. (Report and Recommendation dated Nov. 12, 2013 [Doc. No. 19] at 2–3.) Regarding the merits, the Magistrate Judge found that the Policy's "appraisal provision plainly requires [Plaintiff] to satisfy its obligations to provide information supporting its claim and the amount of loss claimed before there can be a 'disagree[ment] on . . . the amount of loss' sufficient to trigger the appraisal process." (Id. at 11.) The Magistrate Judge analyzed the record—including Plaintiff's proof of loss, Defendant's rejection of the proof of loss and requests for further information, and Plaintiff's subsequent failure to identify any documents that had been provided to Defendant—and concluded that it was unclear what information had been provided to

Defendant.  (See id. at 4–6, 13–14.)  Because the Magistrate Judge "[could] not say on this record that there is no genuine issue of material fact that the appraisal process was properly triggered," he recommended that Plaintiff's Motion be denied.  (Id. at 14–15.)  Plaintiff did not object to the Magistrate Judge's ruling.  (See Order dated Nov. 27, 2013 [Doc. No. 20].)  Accordingly, this Court adopted the Magistrate Judge's recommendation and denied the Motion.  (Id.)  As of April 22, 2014, Plaintiff's representative still could not identify any additional proof of loss, documents, or information that Plaintiff had submitted to Defendant regarding the claimed loss.  (See Preus Aff., Ex. 1 (Alekseyenko Dep. 75:22–76:4).)

### E.   Subsequent Inspections and Estimates

After this lawsuit was filed, Mr. DuPont created new estimates of the cost to repair the property damage.  (See Hussey Aff., Exs. 5 & 6.)  His November 17 and December 10, 2013 estimates each total $219,540.00.  (See id.)  His April 27, 2014 estimate totals $604,056.31.  (See Preus Aff., Ex. 3 at 5.)

Meanwhile, Defendant retained Mr. Mayhew a second time for purposes of providing an expert opinion in this lawsuit regarding the damage caused to the Property by the wind storm.  (See Mayhew Aff. ¶ 4 & Ex. 2.)  Mr. Mayhew performed his supplemental site inspections on April 21 and 28, 2014, and reaffirmed his June 2012 report.  (Id., Ex. 2 at 2.)  Defendant also retained Mr. Elert a second time for purposes of providing an expert opinion in this lawsuit regarding the cost of repairing the damage caused to the Property by the wind storm.  (See Elert Aff. ¶ 3 & Ex. 1.)  In his April 29, 2014 report, Mr. Elert concluded that $78,826.55 was "the cost that a reasonable contractor in the Minneapolis-St. Paul area would charge for . . . the work necessary to repair the damages caused by the

storm on March 19, 2012, including repairs to the roof, ceiling tiles, fence and replacement of the dome." (Id., Ex. 1 at 1, 4.)  He also opined that, in addition to his company, many contractors in the Minneapolis-St. Paul area who were qualified to do the work would be willing to do so for that price.  (Id., Ex. 1 at 1.)  According to Mr. Elert, his estimate exceeded Mr. Berscheid's earlier estimate by $1,192.74 because of "market fluctuations and increases in material costs due to the passage of time." (Id., Ex. 1 ¶ 3.)

F.     **Discovery and Defendant's Summary Judgment Motion**

During discovery in this lawsuit, Defendant deposed Plaintiff's representative, Father Anton Alekseyenko, and Mr. DuPont.  (See Preus Aff., Exs. 1 & 2.)  Father Alekseyenko admitted that he had no actual evidence to contradict Mr. Mayhew's conclusions regarding the damage to the Property, and that he could not identify any portion of Mr. Berscheid's estimate for the cost of repairing that damage that was incorrect.  (See, e.g., id., Ex. 1 (Alekseyenko Dep. 54:12-14, 74:14-22).)  Mr. DuPont, however, contested both Mr. Mayhew's report and Mr. Berscheid's estimate.  As to the former, Mr. DuPont stated that, "based on common sense," Mr. Mayhew's report was "inadequate" and "flawed."  (Id., Ex. 2 (DuPont Dep. 72:4-12).)  While Mr. DuPont agreed that "[o]nly the roof" was damaged by the storm, he claimed that other items needed to be reinforced in order for the new dome to be installed.  (Id., Ex. 2 (DuPont Dep. 121:3-22).)  As for the latter, when asked how he came up with the numbers that comprised, in particular, his December 17, 2013 estimate, Mr. DuPont stated, "That's what I felt we needed to do the job."  (Id., Ex. 2 (DuPont Dep. 130:11-13).)  He said he did not know whether another contractor could do the work for the amount estimated by Mr. Berscheid, (id., Ex. 2 (DuPont Dep. 132:19-22)), and his

8

explanation for the discrepancy between his numbers and Mr. Berscheid's numbers was that "[y]ou can always find someone to do the work cheaper, always, always, always," (id., Ex. 2 (DuPont Dep. 132:6-16)).

Defendant filed its Motion for Summary Judgment on all of Plaintiff's claims on August 22, 2014, and the Motion was heard on October 3.  At the hearing on this matter, Plaintiff's counsel explained that the only dispute remaining among the parties is the cost of the repairs (i.e., Plaintiff is not contesting the scope of the repairs), and that the only estimate that Plaintiff is relying upon is the $219,540.00 estimate from late-2013.

### III.    DISCUSSION

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  Anderson, 477 U.S. at 248.  A dispute over a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Although the party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed, Celotex Corp., 477 U.S. at 323, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256.  Thus, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  No genuine issue of material fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Plaintiff's claims are based on both its alleged right to an appraisal and Defendant's alleged failure to pay the amount owed under the Policy to cover Plaintiff's property loss.  Plaintiff's claims fail on both grounds because Plaintiff has not demonstrated the existence of a genuine issue of material fact.

### A.    Appraisal

As discussed above, Plaintiff's Motion to Compel Appraisal failed because Plaintiff did not identify the documents or information that it provided to Defendant in support of its claim, as required by the Policy.  Plaintiff did not object to the Court's denial of the Motion, and as of April 22, 2014, Plaintiff's representative still could not identify any documents or information that Plaintiff had submitted to Defendant to support the claimed loss.  Because Plaintiff has failed to set forth specific facts showing that there is a genuine issue for trial regarding Plaintiff's initiation of the appraisal process, summary judgment is appropriate

on Plaintiff's claims to the extent that they are based on Defendant's failure to engage in that process.

### B. Amount Owed Under the Policy

There is no dispute in this case that the cause of Plaintiff's loss (i.e., wind) is a covered cause of loss under the Policy. Nor is there a dispute as to the scope of property damage caused by the wind storm (i.e., damage to the Dome, a portion of the roof, several ceiling tiles, and the fence). Rather, the viability of each of Plaintiff's claims for monetary relief is dependent upon resolution of one disputed issue: the amount of money that Defendant is required to pay Plaintiff to cover the cost to repair the damage. Plaintiff would bear the burden of proof on this issue at trial. See Glass Serv. Co. v. Progressive Specialty Ins. Co., 603 N.W.2d 849, 852 (Minn. Ct. App. 2000) ("In a breach-of-contract action against an insurance company, the plaintiff has the burden to prove that the insurer violated the terms of its insurance policy.").

"State law governs the interpretation of insurance policies." Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003). The parties have not identified a choice of law clause in the Policy, and Plaintiff has not objected to Defendant's reliance upon Minnesota law. (See Def.'s SJ Mem. at 18; Def.'s Reply Mem. of Law in Supp. of Its Mot. for Summ. J. [Doc. No. 37] ("Def.'s Reply") at 9.) Accordingly, the Court will apply Minnesota law. Under Minnesota law, the interpretation and construction of an insurance policy is a matter of law for the court, Watson v. United Servs. Auto. Ass'n, 566 N.W.2d 683, 688 (Minn. 1997), and "[g]eneral principles of contract interpretation apply," Lobeck v. State Farm Mut. Auto. Ins. Co., 582 N.W.2d 246,

11

249 (Minn. 1998). "If contract language is clear and unambiguous, 'the language used must be given its usual and accepted meaning.'" Glass Serv. Co., 603 N.W.2d at 851 (quoting Lobeck, 582 N.W.2d at 249).

As discussed above, the Policy requires Defendant to pay "the cost of repairing or replacing the lost or damaged property," but not more than the amount "necessary" to repair or replace the property. According to the Minnesota Court of Appeals, the term "necessary" is not ambiguous. Id. (citation omitted). Rather, "[t]he plain and ordinary meaning of 'necessary' is '[a]bsolutely essential . . . [n]eeded to achieve a certain result or effect; requisite.'" Id. (citation omitted). In addition, "common sense dictates that the amount 'necessary' to replace [property] with one of like kind and quality is a price that is reasonable in the marketplace." Id. at 852. Similarly, the amount "necessary" to repair the damaged property at issue in this case is a price that is reasonable in the marketplace for construction and repair work.

Plaintiff argues that summary judgment is inappropriate because there are two competing estimates of the cost to repair the damage at issue, and the jury must determine which contractor is correct. (See Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. [Doc. No. 35] (Pl.'s Opp.") at 6.) As discussed above, Defendant's designated expert, Mr. Elert, has opined that $78,826.55 is the cost that a reasonable contractor in the Minneapolis-St. Paul area would charge to complete the work necessary to repair the damages caused by the wind storm, and that many contractors in the Minneapolis-St. Paul area who are qualified to do the work would be willing to do so for that price. On the other hand, Plaintiff's

contractor, Mr. DuPont, has estimated the cost of his own services to complete the repair work to be $219,540.00.

Plaintiff has failed to establish a genuine issue of material fact regarding the amount "necessary" to repair or replace the damaged property. First, Plaintiff did not designate Mr. DuPont as an expert in this case, so his testimony regarding the cost to restore the Property to its pre-loss condition must conform to Rule 701 of the Federal Rules of Evidence:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Because estimating the amount and cost of materials and labor needed to complete the repairs requires specialized knowledge, the Court doubts whether Mr. DuPont could provide testimony under Rule 701 even regarding his own estimate. See Pendarvis v. Am. Bankers Ins. Co. of Fla., 354 Fed. App'x 866, 869 (5th Cir. 2009) (finding that the contractor's testimony regarding his estimate of repair costs was inadmissible under Rule 701 because his forecast of the amount, type, and cost of materials and labor needed "require[d] specialized knowledge of construction and repair work").

Second, even if Mr. DuPont could testify under Rule 701 about what he would charge for the repair work, he could not testify about what a reasonable contractor in the marketplace would charge. Not only is such testimony precluded by Rule 701 because it requires specialized knowledge of the construction and repair industry, but—more importantly—Mr. DuPont has not offered an opinion as to what a reasonable contractor in the marketplace would charge, nor does he state that his estimate is what a reasonable

contractor would charge. In fact, when asked whether other contractors could charge what Mr. Berscheid estimated,[1] Mr. DuPont said he did not know. His only comment on industry prices was that "[y]ou can always find someone to do the work cheaper, always, always, always." Thus, Mr. DuPont's testimony is also precluded under Rule 701 because any opinion offered by him as to the price that a reasonable contractor would charge would not be helpful to determining a fact in issue.

The cases cited by Plaintiff are not to the contrary. See Burlington N. R.R. Co. v. Nebraska, 802 F.2d 994, 1004 (8th Cir. 1986) (stating that a lay witness's opinion testimony must be "rationally based on perception and helpful to a determination of a fact in issue"); Farner v. Paccar, Inc., 562 F.2d 518, 528–29 (8th Cir. 1977) (stating that "[t]he qualification of experts and the admission of opinion testimony lies within the sound discretion of the trial court," and finding no abuse of discretion where a witness testified "within his own knowledge and perception"); Gravely v. Providence P'ship, 549 F.2d 958, 961 (4th Cir. 1977) (finding no abuse of discretion in admitting the testimony of the president of a company regarding the safety of the company's product).

Accordingly, while Defendant could present a jury with Mr. Elert's testimony[2] as to what a reasonable contractor in the marketplace would charge for the repair work at issue, Plaintiff could—at most—present Mr. DuPont's testimony regarding the amount that he would charge. However, Defendant is only obligated under the Policy to pay Plaintiff what

---

[1]   As discussed above, the only difference between Mr. Berscheid's and Mr. Elert's estimates is due to fluctuations in the market and an increase in the cost of materials due to the passage of time.

[2]   Plaintiff has not argued that Mr. Elert is not qualified under Rule 702 to provide

a reasonable contractor in the marketplace would charge.  That evidence is undisputed, and the fact that Mr. DuPont would charge more simply indicates that Plaintiff should not hire him.  Because Plaintiff has failed to establish a genuine issue of material fact regarding Defendant's coverage obligations, Defendant is also entitled to summary judgment on Plaintiff's claims to the extent that they are based on Defendant's failure to pay more money under the Policy.

## IV.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment [Doc. No. 25] is **GRANTED**; and

2. Plaintiff's Complaint [Doc. No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  January 22, 2015                s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge

---

such testimony.